IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DIRECT LINE CORPORATION,        )
                                )
        Plaintiff,               )
                                )
                                )
vs.                             )    CASE NO. 3:10-0423
                                )    JUDGE TRAUGER/KNOWLES
                                )
MICHAEL L. CARRINGTON and       )
JOHN DOES(S),                   )
                                )
        Defendants.              )

## REPORT AND RECOMMENDATION

Judge Trauger previously entered a default against Defendant Michael L. Carrington, and remanded this action to the undersigned for a determination of the damages to be awarded to Plaintiff. Docket No. 153. In her Order, Judge Trauger stated in relevant part:

> The court finds that Mr. Carrington's failure to cooperate in discovery is due to willfulness and that the plaintiff, who filed suit over two years ago and is still struggling to receive written discovery, has been prejudiced. Mr. Carrington has been threatened with severe sanctions, including default, on more than one occasion in this action, and certainly less drastic sanctions have been attempted for many months, without success. . . . This court finds . . . that this defendant has attempted to thwart the judicial process and engaged in a pattern of contumacious conduct justifying the entry of default against him.

*Id.*, p. 3-4.

On August 13, 2012, the undersigned entered an Order setting a damages Hearing for October 2, 2012, requiring that Plaintiff submit an appropriate Motion and Affidavit establishing its damages, and providing that Defendant could file a Response within fourteen (14) days of the

filing of the Motion. Docket No. 156. Plaintiff submitted a timely Motion for Damages and Other Relief (Docket No. 162), a supporting Memorandum (Docket No. 163), the Affidavit of David Downs (Docket No. 164), and the Affidavit of Rita B. Brown (Docket No. 165). Plaintiff also filed a Motion for Attorney's Fees and supporting material. Docket Nos. 166-71.

Between the time Judge Trauger referred the damages issued to the undersigned and the time of the Hearing, Defendant sought to have the Hearing continued twice (Docket Nos. 203, 210), he filed a Motion for Additional Time to File an "Answer" to the instant Motion (Docket No. 176), and he filed a Motion for an Extension of Time to File an Affidavit (Docket No. 197). The undersigned granted the Motion for Additional Time to File an Answer and rescheduled the Hearing to October 31, 2012. The Court denied Defendant's "Motion for Additional Time to File Affidavit" (Docket Nos. 197, 201), noting in part that Plaintiff could present sworn testimony live at the October 31 Hearing and that he did not need to submit an Affidavit. Docket No. 201, p. 3.

On October 29, 2012, the Court received a voice mail message from Defendant advising that he was in Baltimore, that his flight had been cancelled because of Hurricane Sandy, and that he did not expect the flight to be rescheduled before the October 31 Hearing. Docket No. 203. The undersigned, therefore, continued the Hearing (Docket No. 203), and on November 9, 2012, entered an Order resetting the Hearing to December 11, 2012 (Docket No. 207).

More than two weeks later, Defendant filed a "Motion for Continuance of Hearing to a Date Between January 9th, 2013 and January 18th, 2013." Docket No. 210. That Motion stated in relevant part as follows:

> I have business commitments that cannot be moved again. . . . I
> originally requested a continuance of the Hearing date as last
2

> scheduled and when the court denied that request[1] I had already
> rescheduled the client's commitment and cannot delay it again. . . .
> I told the court clerk . . . that I need a minimum of 2 weeks notice
> and to please check availability before issuing an order since my
> year ending is the busiest time of the year for me.

Docket No. 210, p. 1 (footnote added).

The undersigned denied the referenced Motion. Docket No. 213. Defendant sought a review of that Order by Judge Trauger (Docket No. 215), but Judge Trauger denied the Motion (Docket No. 217).

Despite the Court's granting Defendant additional time to file an "Answer" to the instant Motion, Defendant never did so. Despite the Court's continuing the damages Hearing twice, Defendant did not appear at the December 11 Hearing.[2] Thus, Defendant has never properly contested the matters set forth in the instant Motion, Memorandum, and Affidavits.[3]

The Affidavit of David Downs, the owner and Chief Executive Officer of Plaintiff,

---

[1] Despite Plaintiff's reference to the Court's denial of a request for a continuance of the Hearing date, at the time Defendant made that statement the Court had not denied any "request" for a continuance of the Hearing date.

[2] Defendant did, however, leave a voice mail message on December 11, 2012, at approximately 8:50 a.m. for Courtroom Deputy Holly Vila. (The Hearing had been scheduled for 10:30 a.m. on that date.) A transcript of that voice mail has been filed as Docket Entry No. 221.

[3] While Defendant has filed a number of documents since the instant Motion was filed, he has never addressed the Motion itself. He has, however, made general statements regarding the Affidavit of David Downs. For example, he has stated that the Affidavit "contains many misstatements/lies that opposing Affidavits will prove up." Docket No. 176, p. 1. He has also referred to "perjury on David Downs' affidavit." Docket No. 197, p. 1. In addition, Defendant filed a "pre-affidavit," in which he made a general statement that the Affidavit of David Downs was "false as to allegations of wrong doing," and was "a testament of facts from David Downs and is a fraudulent attempt to perjure himself to state a rationale for damages." Docket No. 198, p. 2.

Defendant did not provide any factual support for those statements.

3

establishes the following facts. Docket No. 164. Plaintiff hired Defendant on or about January 15, 2004, to be a Marketing Representative and Project Manager. He was ultimately promoted to Executive Vice President. His principal responsibilities were marketing and intellectual technology. He was charged with developing an online catalog and a web-based marketing program to manage dealer websites. He was also responsible for maintaining Plaintiff's electronic files and company data base. Defendant had access to, and a responsibility to maintain, information relative to virtually every aspect of Plaintiff's business with respect to sales, marketing, Plaintiff's products, contacts, reports, websites, vendors, etc. He spent approximately 80% of his time developing the web-based marketing program.

From the date of his hire to the date of his termination, Defendant earned a total of $569,752.64. In addition to this amount, Plaintiff invested roughly an additional $287,928 in order to develop an online catalog (also known as a buyer's guide) to be used for the web program. The amount of $287,928 is also confirmed in the Affidavit of Rita B. Brown. Docket No. 165.

During each of the first four years of developing the catalog and web-based marketing program, from 2006 to 2009, Plaintiff obtained an average of 870 leads per year. Approximately 10% of those leads resulted in orders averaging $10,000 each. With an average of 87 orders per year, at $10,000 each, Plaintiff grossed approximately $870,000 in total orders each year. Of this amount, Plaintiff generated 25% profit, or $217,500 per year. Plaintiff reasonably anticipated that the program would continue to generate leads in excess of at least $650,000 over the course of 2010, 2011, and 2012. Upon losing the ability to access and maintain their web program, as discussed below, Plaintiff lost its ability to bring in this yearly revenue.

After Defendant was terminated for serious misconduct in January 2010, he refused to return Plaintiff's equipment which contained important files and information that he was charged with maintaining. He failed to return a company-owned cell phone SIM card, claiming to have returned it to AT&T. He also reset his company laptop to factory settings and returned it with a new hard drive. He stated that he threw the original laptop hard drive, which contained Plaintiff's confidential and proprietary information, into the Loudoun County, Virginia, trash dump. Defendant also deleted over 3,000 files that contained valuable trade secret information from his company desktop computer. These items contained important passwords, procedures, and files. In addition, Defendant continued to operate his own websites that contained repeated and unauthorized uses of Plaintiff's DIRECT LINE and CLASSICSTAK trademarks and other intellectual property. Defendant linked his website to Plaintiff's websites in order to redirect Internet traffic from Plaintiff to Defendant's own 1-800 number and email address.

Plaintiff states that it "invested nearly seven years and over $800,000 to create its online catalog and web-based marketing program to bring in sales leads only to have the entire program hijacked by Carrington on his termination."

Plaintiff attempted to recreate the web program from scratch, but it became apparent that doing so was too expensive and time-intensive. Additionally, the online catalog was an integral part of the web program, and without the web program, the online catalog was rendered worthless. Therefore, in March 2011, Plaintiff was forced to abandon and shut down the web-based marketing program that it had hired Defendant to develop. Moreover, Plaintiff states that much of the trade secret and confidential and proprietary information Defendant took has become stale and that even if it were returned, it would not be worth what it once was.

Mr. Downs attempted to resolve these issues with Defendant in or about January-March 2010. Defendant, however, tried to get more money from Plaintiff by holding "hostage" the passwords, access codes, and intellectual property. He made resolution impossible, and Plaintiff was forced to initiate the instant action.

Plaintiff sued Defendant for trademark infringement (15 U.S.C. § 1114), unfair competition (15 U.S.C. § 1125(a) and the common law of Tennessee), theft and misappropriation of trade secrets in violation of the Tennessee Uniform Trade Secrets Act (T.C.A. § 47-25-1701 *et. seq.*), breach of fiduciary duty, breach of duty of loyalty, breach of duty of trust, breach of duty against self-dealing, tortuous interference with a business relationship, conversion, and unjust enrichment. Plaintiff also sought injunctive relief pursuant to 15 U.S.C. § 1116 and T.C.A. § 47-25-1703. Plaintiff additionally sought attorneys' fees under T.C.A. § 47-25-1705.[4]

In the instant Motion, Plaintiff sought the following injunctive relief:

1. That Carrington be required to transfer, at his cost, to Direct Line, and provide Direct Line with, all URL's (domain names) acquired by Carrington or Direct Line, and/or URLs for websites containing terms relating to high density storage including, without limitation those URLs listed in Exhibit A to the Motion for Damages and Other Relief;

2. That Carrington be required to provide to Direct Line all passwords and/or log-in information necessary to access all websites and software relating to high density storage including, without limitation, the following:

---

[4] The Court will address the attorneys' fees issue in a separate Report and Recommendation.

6

Case 3:10-cv-00423   Document 230   Filed 12/17/12   Page 6 of 11 PageID #: 1148

      a. Access to the online web program; and

      b. Access to the online catalog;

3. That Carrington be required to provide Direct Line with all copy, graphics, photographs, online catalog (i.e. buyer's guide), and any other confidential and/or proprietary Direct Line information in his possession;

4. That Carrington be required to remove from his websites and be enjoined from using any and all materials obtained from Direct Line, including but not limited to:

    a. Using Direct Line's trade secrets, including passwords or electronic files;

    b. Direct Line's 1-800 phone numbers or any similar phone numbers Carrington has established or used in furtherance of his illegal activities.

5. That Carrington be prohibited from creating or maintaining web programs to generate leads for high density storage products.

6. Engaging in any conduct that infringes upon the DIRECT LINE or CLASSICSTAK trademarks;

7. Engaging in any conduct that dilutes or is likely to dilute the DIRECT LINE or CLASSICSTAK trademarks;

8. Engaging in any advertising that tends to, in a false or misleading manner, associate Carrington's services with Direct Line or with Direct Line's goods and services;

7

9. Engaging in any advertising that tends to adversely affect the public's perception of Direct Line or Direct Line's services.

Docket No. 163, p. 5-6.

At the Hearing, Plaintiff's counsel requested that Defendant be required to comply with this injunctive Order within thirty (30) days of the entry of the Order.

Plaintiff also sought monetary damages in the amount of $1,487,460.22. That amount includes $287,928.00 that Plaintiff expended to develop the on-line catalog, and $455,802.11, which amounts to 80% of Defendant's total earnings (based upon Plaintiff's statement that Defendant spent approximately 80% of his time working for Plaintiff developing the web-based marketing program). These amounts total $743,730.11. Plaintiff sought a doubling of this amount to $1,487,460.22 pursuant to T.C.A. § 47-25-1704(b), which is part of the Uniform Trade Secrets Act (T.C.A. § 47-25-1701, *et. seq.*), and which provides, "If willful and malicious misappropriation [of trade secrets] exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a)." T.C.A. § 47-25-1704(b).

The Act provides broad protection of trade secrets, as well as damages and injunctive relief for misappropriation of trade secrets. The Act defines "trade secret" as:

> information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process or plan that:
>
> (A) Derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable

8

> under the circumstances to maintain its secrecy.

T.C.A. § 47-25-1702(4).

The Act defines "misappropriation" as follows:

> (2) "Misappropriation" means:
>
> . . .
>
> (B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> . . .
>
> (ii) At the time of disclosure or use, knew or had reason to know that person's knowledge of the trade secret was:
>
> (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . .

T.C.A. § 47-25-1702(2).

The Act provides for injunctive relief and also states, "In appropriate circumstances, affirmative acts to provide a trade secret may be compelled by court order." T.C.A. § 47-25-1703(a), (c). The Act also provides for the recovery of damages as follows:

> In addition to or in lieu of the relief provided by § 47-25-1703, a complainant is entitled to recover damages for misappropriation except to the extent that defendant can show a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation and such renders a monetary recovery inequitable. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a

9

> misappropriator's unauthorized disclosure or use of a trade secret.

T.C.A. § 47-25-1704(a).

Plaintiff cogently argues that, because Defendant has refused to cooperate in discovery, it is limited in the damages it can seek to those for which all proof lies with Plaintiff. Therefore, Plaintiff seeks only the most direct and easy-to-prove damages. Plaintiff argues that the amount it paid for the online catalog ($287,928) is recoverable as damages because Plaintiff has been unable to access or maintain the web program. Additionally, Plaintiff argues that Defendant was unjustly enriched because he received leads from the dealer network during the time he kept Plaintiff from accessing its own network. Plaintiff has been unable to quantify that amount because of Defendant's lack of cooperation in discovery. As Plaintiff argues, at least one court has recognized that amounts expended by a successful trade secret claimant for research and development are appropriately recoverable as damages, as either an amount lost by the claimant or as unjust enrichment derived by the appropriating party. *Hauck Mfg. Co. v. Astec Industries, Inc.,* 2004 WL 5523286 (E.D. Tenn.). Additionally, Plaintiff paid Defendant $455,802.11 to develop the online dealer network. That amount, therefore, is recoverable as either the amount that Plaintiff expended without benefit or the amount that Defendant was unjustly enriched.

As discussed above, the Act allows the doubling of any award made under T.C.A. § 47-25-1704(a) if willful and malicious misappropriation exists. There is no question that Defendant committed willful and malicious misappropriation of Plaintiff's trade secrets. The undisputed evidence shows that: he failed to return a company-owned cell phone SIM card; he reset his company laptop to factory settings and returned it with a new hard drive; he stated that he threw the original laptop hard drive, which contained Plaintiff's confidential and proprietary

10

information, into the Loudoun County, Virginia, trash dump; he deleted over 3,000 files that contained valuable trade secret information from his company desktop computer; he operated his own websites that contained repeated and unauthorized uses of Plaintiff's trademarks and other intellectual property; and he linked his website to Plaintiff's websites in order to redirect Internet traffic from Plaintiff to Defendant's own 1-800 number and e-mail address. Thus, Plaintiff is entitled to a doubling of its damages.

For the foregoing reasons, the undersigned recommends that a judgment be entered for Plaintiff against Defendant in the amount of $1,487,460.22; that the Court enter an Order granting Plaintiff the injunctive relief set forth above; and that Defendant be required to comply with that injunctive Order within thirty (30) days from the date of its entry.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. Clifton Knowles
United States Magistrate Judge

11